## ABRAHAM VS. WILKINS.

Where another person signs the name of the testator to his will, thus : "A. B. by C. D., in his presence and at his request," without other signing as a witness to the will, it is a sufficient attestation, under *secs.* 4 *and* 5, *chap.* 170, *Digest*, though not a literal compliance with the statute.

The declarations of a deceased attesting witness, made after the probate of a will, may be given in evidence, on an issue to try the validity of the will, to disparage the weight to be attached to his affidavit in the Probate Court.

It is competent for witnesses to a will to give their opinions as to capacity or incapacity, when the facts or circumstances are disclosed, on which their opinions are founded. *Kelly's Heirs vs. McGuire et al.*, 15 *Ark. Rep.* 601.

The capacity to make a will, is such a degree of reason and judgment as enables the party to comprehend the subject; (*Kelly's case*, 15 *Ark.* 556,) but there may be incapacity without a total deprivation of reason and understanding.

The statute does not require that the witnesses to a will shall subscribe it in the presence, actual or constructive, of the testator, according to the construction in *Rogers vs. Diamond*, 13 *Ark.* 487.

Though the court may have erred in giving an instruction at the instance of one party, yet, if it be neutralized by one, at the instance of the other, it is not an error for which judgment will be reversed.

Where a motion for a new trial was filed in the court below, and overruled, and all the proceedings are put upon the record and brought before this court for review, the reversal or affirmance of the judgment does not depend upon the question, whether the court below did or did not err in some of its decisions; but upon the question, whether the decision of the court, overruling the motion for a new trial, was right.

Where the jury has found against the validity of a will, upon the ground of the mental incapacity of the testator, and it appears from the evidence, that he was laboring under delusion at the time—that he had lost the power of discriminating objects, and of combining and arranging ideas, &c., this court will not set aside the finding.

*Appeal from Lafayette Circuit Court.*

Hon. SHELTON WATSON, Circuit Court.

WATKINS & GALLAGHER, for the appellant.

PIKE & CUMMINS, for the appellee.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

John Wilkins, of the State of Tennessee, filed a petition in the Lafayette Circuit Court, stating, that on the 9th day of November, 1851, his brother, Allen T. Wilkins, a resident of said county, died, seized of real and personal property, without having been married, and leaving no child lawfully begotten, father or mother, him surviving. That, after his death, James Abraham, who is made defendant, produced before the Probate Court of said county of Lafayette, a paper purporting to be the last will of said John Wilkins, which, on the 24th November, 1851, was probated and admitted to record, at the instance of said Abraham, a copy of which is exhibited. That by said paper, purporting to be such will, it appeared that said Allen T. had devised a considerable portion of his property to Abraham, and made him his executor, &c., and by virtue thereof, he was claiming the property, and acting as executor, &c. That petitioner was the brother, and one of the heirs at law of said Allen T., and interested in the probate of the pretended will: and he expressly charges that the said paper, so probated, is not the last will and testament of the said Allen T., the same being invalid. Wherefore, he prays the court to direct an issue to be formed, and submitted to a jury, according to the statute, &c., to try and determine the validity thereof, &c.

The will is as follows:

"In the name of God, Amen. I, Allen T. Wilkins, of the county of Lafayette, in the State of Arkansas, being now low in bodily health, and calling to mind the frailty and uncertainty of human life, and being desirous to direct how my worldly affairs shall be disposed of, after my death, do publish this to be my last will and testament, hereby revoking all others, by me, heretofore, at any time made.

And *first:* I hereby nominate and appoint James Abraham, of the county and State aforesaid, to be the sole executor of this my last will and testament.

*Second:* My will is, that all my just debts and funeral ex-

penses be fully paid by my said executor: and he is hereby required to ship all my present crop of cotton, and apply the nett proceeds to the payment of my debts as aforesaid.

*Third:* It is my will, that my negro woman, Sarah Jane, and her child, John, be emancipated and set free, as soon as John, the child of Sarah Jane, shall arrive to the age of twenty-one years; until which time, he shall be in the charge of the said James Abraham, and be taught some trade, so as to never become a charge upon the community; but the said Sarah Jane shall be free from the time my debts shall be paid; and I request my said executor to see that the said Sarah Jane and John, herein emancipated, shall be disposed of, and provided for, in a proper and suitable manner.

*Fourth:* After my debts, and funeral expenses are all fully paid, and discharged, and the negro slaves herein before named excepted, I give and bequeath unto my said executor, all my property, both personal and real, to him, his heirs and assigns, forever.

In testimony whereof, I have hereunto set my hand and seal, and do publish this my last will and testament, this 9th November, 1851.

ALLEN T. WILKINS. [SEAL.]

By MOREHEAD WRIGHT, in his presence, and at his request.

We, William H. Dillard and William Gant, have hereunto subscribed our names as witnesses, at the request, and in the presence of the said Allen T. Wilkins, and in the presence of each other, this 9th November, 1851.

WILLIAM GANT,

WHILLAM H. DILLARD."

Process having been served upon Abraham, the court directed an issue to be formed for the purpose of trying the validity of the will; whereupon, Abraham filed a plea alleging its validity, to which the petitioner took issue. See *Digest, chap.* 170, *sec.*

32. The issue was submitted to a jury, upon the following testimony, in substance:

ON THE PART OF ABRAHAM.— *William H. Dillard*—William Gant and myself signed the will at the request of Wilkins, and in the presence of each other. Saw Wright sign Wilkins' name to the will, and heard Wilkins request him to do so. Heard the will read over to him, by Byrne, twice. Heard him correct an error in relation to the name of a child, which was written *William* in the will, and Wilkins said his name was not *William*, but *John*, whereupon the correction was made. Wilkins requested me to send for Byrne, which I did, and when he came, Wilkins requested him to write his will, and proceeded to tell him what disposition he wanted made of his property. I am a farmer. Wilkins was sick seven or eight days. I was present when he died, which was about an hour after the execution of the will. The will was signed by Wright and witnesses, in presence of Wilkins. Heard him say nothing more about will, except probably, to request some one to take care of it. Think some one asked testator, after will was signed, what he wanted done with his property, and he made no satisfactory answer that I heard. Was present when Judge Fort, Parson Harris, and others, came into testator's room. His mind was wavering at times; heard him make no nonsensical remark. Abraham is not related to testator. It was two hours from time testator requested me to go for Byrne, until his death. I went to testator's room on the day he died, at 8 or 9 o'clock, A. M., and he lived some three or four hours after I went there. When I first entered the room, he seemed very sick, but knew me when I spoke to him, and I had a conversation with him. After the execution of the will, and near his death, he made some remarks which I cannot recollect. That morning, he seemed to see some person at the bed post, and would speak as though he was talking with some one. He appeared to know every one with whom he conversed, and seemed to know every thing when in conversation, but when not, talked a little at random. If he made any

flighty remarks while the will was being prepared, I did not hear them, and I was in the room all the time. He could write, but made a bad hand of it. When the will was presented to him, he tried to write his name, but said he could not. Byrne then said to him, any one else could sign it for him, and said, here is Major Wright, he can do it. Testator then requested Wright to sign his name. I did not hear testator ask the name of the clerk, at the time he was trying to write his name; was close enough to him, and if he had asked the question, would have heard him. His name was signed to will before witnesses. Byrne asked him who he wanted to sign his will, and he said myself and Gant; and we then asked him, if he wanted us to sign his will as witnesses, and he said, yes. We signed it in his presence, and in the presence of each other. Did not see the will handed to testator after it was signed; he saw it after it was executed. According to my best recollection, witnesses and Wright signed the will on testator's bed side. Believe testator was rational, when he signed the will, and was so in the morning when I went there. Thought he was at himself, and understood what he was doing when he dictated the will, and had it signed by Wright. Judged from his appearance, as to his rationality. He did not seem to think he would die, but was fearful he might, and asked me what I thought of his condition? I told him he was bad, but might get well. In a short time he requested me to go for Byrne; I did so, and when Byrne came, Wilkins asked him to write his will, and told him how he wanted his property disposed of. Byrne told him he had no ink and paper there. Testator told Byrne he wanted Abraham made his executor: wanted him to ship his cotton and pay his debts: and he wanted to emancipate Sarah Jane and child, servants belonging to him, and wanted Abraham to raise the child, until it was twenty-one years of age, and to learn it some trade, that it might not be any expense to the county; and that he gave Abraham all the balance of his property, but would have made a different will, if he had have had enough to be worth much. Byrne nor myself made any sugges-

tion to him as to the person to whom he should will his property. Abraham's name was suggested by no one. At the time he dictated the will, testator did not give any reason why he wanted Abraham to have his property; but during the court, at which he was taken sick, I heard him say, and frequently before, that he intended to give all his property to James Abraham. He said he was the best friend he had. From the manner of testator, and his correcting the mistake in relation to the name of the child, and his telling Byrne to be particular, and have it right: I am satisfied he was of sound mind, when he dictated and signed the will.

*On cross-examination:* Am not prejudiced or interested in this suit. Known testator since the year 1841: he was a blacksmith, and afterwards an overseer; was a bad scribe; had but three fingers on his right hand. On Friday, before the Sabbath on which he died, he requested me to tell his girl, Sarah Ann, at his place in Red River bottom, to send him some clean clothes, and a boy he had hired to wait on him: that Higg's negroes (at whose house he was sick in Lewisville,) were scarce. On Saturday morning, he repeated the request; and on Sunday morning, he asked me if I had been down to the bottom. I told him no, and he made the same request. He was a single man, and had no relations here, that I know of. Have frequently heard him say that James Abraham was the best friend he had on earth. A few days before he was taken sick, he asked me to sign a bond for him, saying, he only wanted me to stand a few days, until Abraham came out, and then he would get him to go on it. Heard him say during court, a short time before he was taken sick, and in the fall before, that he intended to give Abraham all he had. He seemed to have more confidence in him, in relation to the management and care of his girl, Sarah Jane, by whom, he said, he had a child, and another, that died, than any one else. I told him, if he thought it was his child, he ought to free it himself, while living, and he said he intended to do so one of these days. I told him these things were frequently neglected after a man's

death, and referred him to a number of cases in this county.  He
said there were men in this county who would attend to these
things.  I asked him, who?  He said Abraham: that Thomas
Edwards had given him his property, and that the overseers,
generally, on Red River, had more confidence in Abraham than
any one else on the river.  When in conversation, testator al-
ways gave rational answers.

*Morehead Wright.*—Testator overseed for me five or six years.
I signed his name to the will.  Went into the room where he
died, soon after the will was taken in—several persons around
the bed side.  Heard him say something about a mistake at the
time the will was read to him: he said, the name is *John.*  I went
to the bed side.  Something was said, about this time, about sign-
ing a will, and my name was mentioned.  I asked testator if he
wanted me to sign the will, holding it up in my hand before him;
and he said he did.  I did not see the witnesses sign the will.
When I went into the room, testator was lying in bed.  Was in
his room some hour and a half before the will was signed.
He seemed a little alarmed.  I told him there was no danger;
that if I had service for the time he would live, I would
make a fortune, and he said, yes.  I told him I had seen him
much worse, which seemed to compose him.  He alluded to cer-
tain land, which I had recently purchased of Stricklin, and
said it was a good purchase, and I had done well.  Said it was
all good, except right along here, running his hand along by the
bed side; a sign which I understood.  I made the purchase re-
ferred to.  The girl, Sarah Jane, was willed to testator by Le-
may.  I never had any conversation with him about her child.
He seemed to have great confidence in Abraham, &c.  Never
heard him say anything about his relations, except a brother in
Tennessee.  Heard him say once, he was expecting his brother
out, and wanted to get him on my upper plantation.  Have seen
testator sick frequently, and when fever was on him, as he was
dozing, he would talk a little wild.  I was on the gallery when
the will was brought there (to Higg's house,) by Byrne; went

into the room soon after; testator was lying on his back. Was not in when he tried to sign the will. Was called by some one, who said testator wanted me. Walked up to the bed side, held the will up in my hand before testator, and asked him if he wanted me to sign it, and he said he did. I do not recollect of seeing any thing on the bed, but did not notice. I left in a few moments after the will was signed. The name of testator, together with my own name, subscribed to the will, are in my handwriting. I signed the will on a small table, on the opposite side of the room. Did not see witnesses sign it. I left, with Capt. Gant, soon after will was signed. Do not know whether will was taken to bed side after it was signed. Did not see it shown to testator after it was signed. It was at his bed side, when I was called on to sign it. He was lying on his back at the time I signed it, or was a moment before. My impression is, there was some alteration in the will, in relation to a child, by Byrne. I left before testator died. When I first went into the room, his condition was bad—seemed to be dying—seemed to be flighty at times in his mind, and said something about fire, and said blow it up, or something of that sort. Talked at random.

*On cross-examination*—Not more than two hours from time I first went into testator's room, until his death. Was in and out until I signed the will, and then, myself and Gant, walked up town. Was in the room some little time before, and about the time the will was signed. Occasionally, testator's mind seemed a little flighty, but when his attention was drawn to any particular subject or thing, he seemed to understand it, but would waver instantly. I did not think his mind strong enough to *organize* anything, but when his mind was drawn to anything, he understood it. At the time I was called on to sign the will, think was doubtful as to his ability to transact business. When I told him not to be alarmed, his voice was not as natural as a well man's, but he spoke ready and quick.

*A. Byrne:* I wrote the affidavits of the witnesses to the will in Probate Court: am clerk of said court. On the morning of

the day that testator died, J. B. Higgs came to me, and told me he wanted to see me. I started down to see him, and meeting Dillard, he also said testator wanted to see me. When I went into his room, after speaking to him, and asking him how he was, he said his friends said he was bad, and that he wanted to fix up his business. I asked him what disposition he wanted to make of his property? He said he wanted Abraham to take charge of his business—wanted a certain negro woman and child set free, naming the woman, I think. Wanted the child to stay with Abraham until it was twenty-one years old, and wanted him to learn it some trade, so that it might not fall an expense on the community, and to see that the woman and child should not suffer, and to attend to them. Spoke of his debts, and said he wanted Abraham to ship his cotton and pay them—said he had plenty to pay his debts, &c. Expressed a wish that his business might be managed by Abraham, without coming into the court house, or without law. The above is the substance of his request. I stood about some time, thinking he would forget it. While standing there, he told me two or three times to go and fix it up. I then went to my office and wrote the will. The name of the child, I thought he intended to emancipate, I got from the papers in a suit between testator, as executor of John Lemay, and Henry Lemay. When writing the will, I did not recollect of testator mentioning land particularly, but that he referred to all his property: I, therefore, inserted it with his other property. Then took the will to testator's room. Wright and Lungreen were sitting in the gallery: they asked me what I had, and I told them it was the outlines of testator's will. Parson Harris, and others, were holding religious service in the room. I laid the will on the table in the passage. While they were singing, I stood at the foot of the testator's bed, and he called, or beckoned to me, and asked what all this meant, and said he was not as bad as all that. When service was over, I went in with the will, and after reading a line or two, I asked him wha he wanted done with his land, and he said, let it all go together.

I then proceeded to read the will, until I came to the name of *William*, and testator said, his name is not *William*, but *John*. I doubted a little, and asked him if he was certain, and he said he was. I then made the correction of the name, wherever it occurred in the will: then read the whole will over to him a second time, as corrected, and he approved of it, and said it was right. I then went to the passage, and finding Wright, Lungreen and others there, told them testator was about to sign his will, and asked them to come in. We then went into testator's room, got a glass frame, testator was propped up in the bed, and I gave him a gold pen to write his name, and a piece of paper on the glass frame. He made two or three strokes with the pen, and said he never could write with those kind of pens: said he was weak—that he had eat nothing for two or three days. I told him he had better have a quill, and he called upon Capt. Gant to make a pen. I told him any one else could write his name for him. I think he then called upon Maj. Wright. Do not recollect whether I suggested his name or not—may have done so. Wright then came up to the bed side, took hold of the will, and asked testator if he wanted him to sign it for him, and he said, yes. Wright then signed the will. The witnesses then signed it—I do not recollect whether at the request of testator or not. Gant signed first, and turned off, and did not see Dillard sign his name, and Dillard then came back, and his name was stricken out, and he re-wrote it in the presence of Gant, the other subscribing witness. I then sealed the will, and handed it to one of the witnesses to take charge of. After will was read a second time and signed, it was not read again to testator. Abraham was not in the county at the time. I saw Capt. Gant sign the will.

*On cross-examination*—During the time I stood about, after testator requested me to write his will, his voice was unnatural—his appearance was bad—he called Lemay, Wright. When directing me about his property, do not recollect that he named his property specially, but did speak of it generally: but named

the negroes that were emancipated, and his cotton.  About the time, or soon, after, the will was signed Lungreen asked him what he had done with his property, and he said he had given it to Abraham; that he did not have much, or he would have made a different will.  I was standing at the bed side when the remark was made.  I have no recollection that testator said anything about a pencil when I handed him my pen to write his name.  When no one was talking to him his mind seemed wavering, but when his mind was directed to any particular subject, he seemed to understand it.  Heard him make no remark about Capt. Pike.  Do not reco'lect whether the will, when signed by Wright, was on a table or bed.  I am not positive where witnesses signed the will. My recollection is, that Dillard's name was erased at the bed side.  My best recollection is, that the will was signed at the bed side.  I am not positive whether Wright signed it at bed side, on glass frame or not, but think he did not.  It was signed in the room of testator, and if it was signed on the table he could have seen it; believe the will was signed in his presence; cannot say positively that testator saw it; his eyes looked wild at the time. My attention, after the signing of the will, was directed to the sealing of it.  I do not recollect positively where witness signed it.  Do not recollect of any flighty remarks of testator about the time will was signed, except that mentioned above.  He seemed to be dying from that morning.  His appearance the whole time was bad.  I cannot say what the condition of the testator's mind was, when the will was signed.  Do not know.  As soon as it was signed, or a short thereafter, I enveloped and sealed it up. Do not know whether it was shown to testator after it was signed or not.  After it was read to him, he approved of it, and said it was right.  Do not recollect of any other acknowledgment. I took down the testimony of the subscribing witnesses when the will was probated.  Gant felt his dram at the time, but was not drunk, &c.  I have no recollection of saying to Lungreen and Gant, when I came in with the will, that it was of no account. Do not recollect whether I suggested the name of witness to will

or not; may have done so.   When testator saw Lemay, he seemed to know him.   He knew me.   When I had written the will and carried it down, after religious services were over, I suggested to testator that it was ready.

*Abraham* then read in evidence, the will with the probate affidavits of Dillard and Gant, attached, &c.

The affidavit of *Gant*, who had, in the meantime died, is as follows: I was called upon to subscribe to the instrument to me here shown, and Allen T. Wilkins acknowledged the same to be his last will and testament.   His name was written by Morehead Wright, at his request, and in his presence.   After the same being read to him twice, he declared it to be his last will and testament; and made certain corrections in regard to the name of a negro, whose name was written William, and changed to that of John, every time the name occurred in the will.   This was previous to the time Wright was asked to sign the name.   To the best of my recollection Wilkins called upon me to subscribe my name as a witness, to the will, and I subscribed the same in the presence of William H. Dillard, the other attesting witness.   At the time Wilkins asked Wright to sign his name to the will, for a moment and a half or two minutes he appeared to be rational, after which time, he appeared not to be rational, but flighty.

ON BEHALF OF PETITION.—*Dr. Purdom*—Have been a practising physician about eight years.   Attended testator in his last illness.   He died of pneumonia, which had assumed a typhoid type, 9th November, 1851; called to see him on Friday, and he died following Sunday.   He was taken sick on Wednesday night; I saw him on Thursday, but not as physician.   Dr. Wilson was called to see him on Thursday morning; he was then laboring under pneumonia.   Before he was taken with pneumonia, he had the influenza.   When I was first called in, the disease was of rather an aggravated character, pulse weak and quick, some 140 beats to the minute, skin cold and clammy.   He told me he had from seven to ten operations, from medicine he had taken the night before.   Coughed considerably ; some little blood in his ex-

pectorations; complained of a violent pain in his right side. Typhoid fever generally prostrates a patient very soon, and the mind is generally affected. When first called in, saw nothing unusual about his mind, except he was stupefied and drowsy, attended him until he died. Saw no decided change in his mind until Sunday, the day he died, at about 2 o'clock, A: M., at which time I was sent for hastily ; found him sinking into a collapsed stage; hands cold and clammy ; the feeling of a dead body ; pulse low, and almost imperceptible ; his mind giving way, but to no great extent. His mind continued to fail until his death, owing to his physical organs giving way. The first time I saw any change in his mind, was on Sunday morning, about 2 o'clock, A. M. It was but little affected at that time. Remained from that time until sunrise, at which time a considerable change had taken place in his mind. Appeared a little deranged, thoughts totally incoherent, but he at times recognized any one that was about him, but occasionally talked wildly, except when some one was talking to him. He at one time seemed to be talking to the bed post, and when he was told what it was, said, *yes*, he thought it was a man. Do not recollect whether this remark was made before or after breakfast, but it was made before the will was signed. Never saw a case of typhoid fever, but what patient was occasionally deranged in his mind, and would talk wildly. Left him at sun up, and was absent hour and half; when I returned, examined testator, and found him sinking, both mentally and physically ; his mind still more unsettled. I think it was when I returned, he seemed to be talking to the bed post. I think this was the first time I had observed that he was losing his powers of distinguishing objects. It was at this time I told him it was a bed post, which he seemed to understand, and would then relapse off again I was off and on in his room till he died ; while Judge Fort was in the room he called him *Willis*. About this time a negro boy of his came into the room, and he seemed not to know him. Some one asked him if he knew the boy, and he said not. He was then told it was his boy Brice, and he said yes ; and asked

him what he was doing there? Wanted to know if he was run-off: spoke short. The boy said he was not run-off, but had come out to wait on him. Testator said he did not want him, that he would be down home to-morrow. Did not seem to be conscious of his condition. All this took place before the execution of the will—say some hour and half. Recollect nothing else said by testator before execution of the will. He was talking all the time wildly. I was present when the will was executed. Do not recollect of seeing witnesses, or Wright sign it. Think the name of Wright and witnesses were suggested by Byrne. There was a considerable crowd in the room at the time. I was not present when the will was read by Byrne. Saw testator attempt to sign will. It was handed to him on looking-glass frame. I paid but little attention to execution of the will. At the time, and for half an hour before he attempted to sign will, he was more calm and less nervous than before. Recollect no circumstance indicating any more mental derangement at the time of executing the will than before. His features were sharp ; looked wild out of his eyes ; had looked so from early in the morning; appearance indicating speedy approach of death. I was at bed side about the time will was signed. Do not recollect whether it was shown to him after it was signed or not. Did not hear him acknowledge will. About the time it was signed, heard Lungreen ask testator, what he was going to do with his property, and he said he had given it to a man in Tennessee. He was asked his name; and said he did not recollect his name then, but would tell directly. He was not in possession of his mental faculties at the time will was signed. Do not think his mind was entirely sound from 2 o'clock, A. M., that morning. At the time of the execution of the will, do not think he was conscious of what disposition he was making of his property. About day light, on the day of his death, myself and W. A. Higgs, were talking of certain persons on Red River, who kept their wills by them, and Higgs asked testator if had a will made? He replied not. Higgs then asked him if he did want to make one? Do not recollect his reply, if he made any. I then

remarked to Higgs, that he was not in a condition to make a will. I cannot give the reason why testator was more calm some half an hour before the execution of the will, than he had been since 2 o'clock that morning. Remarked the fact to Byrne at the time he was preparing to read the will to testator. At the time will was handed to testator, heard him make no incoherent remark.

*On Cross-examination*—In speaking of testator's mind, I do not mean to say he was entirely bereft of reason; but that his mind was considerably impaired from 2'clock, A. M., on the day of his death until the will was executed; but at the time the will was signed, I do not think he knew what he was doing. He would answer any question that was asked him. I was not in his room when he directed Byrne about his will. Did not hear it read. Byrne was writing on a small table when I went in. Did not know what he was writing. Testator was more calm for some half hour before the time of execution of the will than before, but cannot say that he was more rational. When the brain is affec-ted, it is frequently the case that patients become more rational a short time before death than before. There is always fever in pneu-monia. The brain is frequently affected from this disease. Never saw a person in his condition that brightened up before death. There was a general conjestion of the blood from the external to the internal organs. From 2 o'clock, A. M., gave him three doses of quinine, calomel and camphor. Gave him no mor-phene.

*L. B. Fort*: Was not present when will was executed. Visited testator about 11 o'clock, A. M., of the day he died, with Parson Harris. Went to his bed-side; some one asked him if he knew me, and he said yes, that it was Judge Fort. I asked him how he was, and he said he was very sick; seemed to be alarmed and looked bad: had a wild appearance. I told him Harris had come to pray for him, and asked him if he wanted him to pray? He said yes, he wanted all of us to pray for him. Harris sung and prayed. Testator seemed to be more composed during service than after; seemed interested; after service, I went to his bed-side,

and felt his pulse ; he was restless; I thought he would die in a short time. Remained there some ten minutes, he said he was very bad. As I turned off, he said come back *Willis !* Some one said, it is not *Willis*, but Judge Fort. He then said he knew it was Judge Fort. At one time, while I was there, he pointed to the bed post, and asked who it was? When he was told, he said it had fooled him twenty times ; which caused me to think his mind was wandering. There was nothing else said that I remember which showed absence of mind. He was frequently turning over, and muttered a great many things, which I could not understand.

*On cross examination*—When Parson Harris was engaged in religious services, testator seemed to understand what was going on, and to be engaged in the service ; seemed more composed, than just before or afterwards. When asked a question, he seemed rational, and to understand.

*John Brown :* Saw testator two or three times during his illness. Was there on the day he died, some two hours before he died. William Higgs and Young were there when I went. Remained about an hour. Had some conversation ; his mind seemed flighty ; looked wild ; spoke to the bed post, and called it McDaniel. Young asked him what he wanted done with his property ? He said he wanted a brother in Tennessee to have most of it. This was about ten or eleven o'clock. May have been as late as eleven. Was there when preacher was sent for. Did not hear testator ask Young to write his will. Think it was Higgs that asked him to write it. Left before the minister came. If Byrne was there, do not recollect it.

*H. R. Lungreen :* Saw testator several times during his illness. Saw him the evening before his death. He talked flighty and nonsensical for a man in his situation. Hands cold'and clammy; seemed to have great internal heat ; wanted water constantly. His chief conversation was about shoeing Capt. Pike's horses. Pike had employed me to shoe his horses during court, and as I was not much in the habit of shoeing, I had asked testator to do it for me,

which he promised to do, but was prevented in consequence of his sickness. He also said something about Fort's negro boy Oliver being a good shoer. This was a boy that had once worked with him in a smithshop. Spoke of what he could have done with him, if he had remained with him. I remained but a short time. Returned next morning between daylight and sun up. Met Lewis A. Fort, or Brown on gallery, asked how testator was, and he said, worse. Went into testator's room, no one in there. Spoke to him and he did not know me. He was talking at random. Said what pretty pipe stems the bed post would make. I thought he alluded to posts. Returned home, got breakfast, and went back again about seven or eight o'clock; absent hour and a half. Went into testator's room, but did not speak to him. Was in and out of room for hour and a half. Mind wandering; talked incoherently. Went up town, and returned again at ten. Had no conversation with him; several persons there. Soon after, Fort and Harris came. I went into gallery, and took a seat with Wright. Remained there probably an hour. While there, Byrne came along with a paper in his hand. I asked him what it was, and he said the out lines of Wilkins' will. In a short time, Byrne came out of testator's room, and said he was about to sign his will. I went in, and after Byrne had read a part, testator stopped him, and there seemed to be something wrong about some children; testator said something, which I did not understand, but think he said the name is *John*. Byrne told him he got the name from the papers in the Lemay suit, &c. Byrne then corrected the will on a table, and brought it back and read again. Byrne, or some one else, gave testator a picture frame, and piece of paper to write his name upon. I was standing behind Byrne; near enough to touch him, toward the foot of the bed, and by the bed side. Some one asked testator if he could write his name, and he said yes. He was then propped up, and some one gave him a pen made of a goose quill. He made some motions as though he was going to write; stopped and seemed to consider; asked the first name of the clerk? Dillard, I think, said, A. Byrne. Testator said yes,

that is it; then tried to write and could not; then turned his head towards the corner, and said, hand me down that pencil. Byrne then said that he could write his name if he would request it, or any one else. At that time, Maj. Wright entered the room, and Byrne said, here is Major Wright, he can do it; and then some one called Wright, and he came to the bed side, and held the will in his hand, and asked testator if he wanted him to sign it, and he said yes. Wright then took the will, I think, to a small table in the room to sign it. While Wright and others were near the table, I went up to the bed side, and asked testator if he should die, what he wanted done with his property? He said he wanted a man in Tennessee to have it. I asked his name, and he turned over, and said he would tell me directly. A short time afterwards, all left the room, except Dillard and myself, at which time a negro boy came into the room; I asked testator whose boy it was? He said he did not know. Dillard then asked boy who he belonged to, and he said Mr. Wilkins. I then asked testator, if it was not his boy, and he said yes, and asked the boy what he was doing out here, and said he was run off. Boy said no, he come to wait on him. Testator said no, he was not sick; for him to go back, and tell Irvin and them, he would be down there in the morning. About this time, Mrs. Higgs came into the room, and asked me to go to the store after some wafers. Testator turned over, raised up, and clambered towards the wall. I told Dillard to pull him down; this was about the last of him. I went up to the store after the wafers, and when I returned he was dead.

When Byrne brought the will to the bed side, I think it was the second time he asked testator who he wanted to have his property, and he replied he believed Jim Abraham was as near a neighbor as he had.

Byrne handed him the pen to sign his name. It was a goose quill; he tried to write and could not; then turned towards the corner, and looking towards the ceiling, said hand me down that pencil. Did not hear him say he could not write with such a pen. Was as close to him as one any except Byrne.

Byrne called on witnesses to sign will. Heard no one else. Knew both witnesses. Was standing by bed side from time will was read until a few minutes before testator died. Testator did not see witnesses sign will, and could not if had he tried. No recollection of hearing him acknowledge will. It was not brought to him after it was signed; heard him make no allusion to it afterwards. He was speechless when I left him to go after wafers.

(Against the objection of Abraham, the court permitted the witness to prove the following declarations of Gant, deceased, subscribing witness to the will.) I saw Gant a day or two after will was probated; asked him if he had proved up the will; that he had told me he would not. He said yes, he had proved something that did not amount to much; that if they had asked him the right questions he would have *knocked the black out.* Never heard him say any thing about the sanity of testator after probate of will.

The will was signed in the north-east corner of room. I did not see it signed; saw them writing at something; supposed it was the will. Am certain it was not signed on bed side, unless it was when I went after wafers. Testator's bed in south-west corner of room.

*On cross-examination*—Not certain that I heard all that was said, or recollect all that occurred in the room just before will signed. Am certain that testator did not request Wright to sign his name, till told by Byrne that he, or Wright, could sign it. At the time Byrne said here is Maj. Wright, he can sign it, testator said yes, Major, I wish you would. Dr. Purdom was in room, when negro boy Brice came in. Capt. Gant was entirely worthy of credit on oath.

*Re-examined*—The reason testator could not have seen the will signed was, because there were too many persons between him and the table; he could not have seen it as I could not.

*George D. Perry*—Had a conversation with testator month or two before his death. He spoke of the manner in which he had made his property, and said he wanted his brother in Tennesse, I think he said John, to have it.

*J. K. Young:* I am an attorney residing here, (Lewisville.) Negro boy came for me Saturday morning, 8th November, 1851, little after day light, day before testator died, and said testator wanted to see me. Went to his room. He asked me if the papers were fixed up in the suit between him and Lemay? Told him Pike had attended to it. He asked me if Pike was gone? I told him he had. He then said if the papers were not fixed up right, he wanted me to do it, referring to a suit which had been disposed of a few days before, in which Pike was his attorney. Remained there half an hour. Boy came for me again about same time next morning, saying Wilkins wanted to see me. Went to his room, asked him how he was, and told him not to be alarmed. He said he was not scared. Asked him what he wanted with me? He said he might die, and if he did, wanted to say certain things to me as a particular friend. He wanted me to write to his brother John, at Vernon, Tennessee, and say to him that he wanted him to have most of his property; and if he was not living, he wanted a sister in Carolina to have it, and if she was not living, he wanted her children and John's to have it. Told him I would comply with his request. Remained there some three quarters of an hour. Returned again about 7 or 8 o'clock, and asked him again about the disposition of his property. He lay a short time, and said he wanted me to write to his brother John, and say to him, he wanted him to have most of it, and another man the balance, and he would see that man himself; and made some statement in relation to a sister as before. Remained some ten or fifteen minutes, and then took a walk with W. A. Higgs. Absent half an hour. We were talking about testator's request. Told Higgs it could not be carried out without a will, and if I thought he was capable of making a will, would suggest it to him. Higgs said he thought I ought to do it. We then returned. I told testator his request could not be carried out without a will. That if his father and mother were dead, his brothers and sisters would share his property equally. He then requested me to write his will. I again asked

him about the disposition of his property, and he said he wanted his brother John to have most of it, and another man the balance, and he would see him. I told him I would comply with his request. Went to my office to write will, and meeting Dr. Purdom, he asked me what I was going to do? I told him I was going to write Wilkins' will. He said it was not worth while, for Wilkins was not capable of making a will, and had not been for hours. Concluded not to write it. Returned to see testator about 9 or 10 o'clock—spoke to him—do not think he recognized me. His hands were cold and clammy—could feel no pulse. He was lying in south-west corner of room. I took a seat in north-east corner—remained there some hour, during which time, Judge Fort, Parson Harris and others, came in, and sang and prayed. Do not think testator was conscious of what was going on, unless his attention was drawn to the subject. He muttered many things, which I could not understand. While they were singing and praying, he seemed more calm and quiet. I left the room soon after the services were closed.

*W. A. Higgs:* Testator died at my house. Saw him frequently during his illness. Saw him night before he died. Left his room at late bed time. Was waked up at three or four o'clock next morning, and told he was dying. Went in to see him—he looked wild and bad. Dr. Purdom and I had a conversation in relation to persons keeping wills by them. I asked testator if he had a will? and he said not. Told him he ought to make a will. Purdom remarked to me, he was not capable. He was muttering something all the time—recollect nothing he said, except he asked if the jury was empaneled, and had the witnesses all come. After day light, he requested me to send for Young, which I did. Young came, &c.: (testifies substantially same as Young, as to conversation between Young and testator, about his property, his making a will, &c.) Saw Wright, and witnesses to will take it to a table in testator's room. Testator was propped up in the bed and tried to write his name on a piece of paper, which was handed him on a glass frame. I was close to the bed. He tried

to write, and was then laid down, and said, hand me some of them fine pipe stems: said, look up there! When will was read to him and the name of *William* read, he said, his name is not *William*, but *John*. I think the will was read a second time, and when they came to the name of *John*, he said yes, *John* is the child. When testator could not sign will, Byrne said, I can sign it, or any one else if you request it: said, here is Major Wright, he can sign it. Wright then came to bed side, took the will and held it up, and asked testator if he wanted him to sign it, and he said yes. This was a short time after he had been laid down, and said, look up there, and hand me those pipe stems. Will was signed in north-east corner of room. Do not think testator saw it signed, as there was a crowd between him and table. Cannot say that testator took any notice of any one at the time will was signed: but do not think he did.

*Gant* told me if they had asked him the proper questions, at the time the will was probated, he would have *knocked the black out*, but he did not want to volunteer. Said testator knew no more what he was doing, when fixing will, than after he was dead. I asked him why he did not state that to the court when will was probated, and he said he did not want to volunteer.

(These declarations of *Gant* were admitted by the court, against objection of *Abraham*.)

*On cross-examination—Gant* was worthy of credit in any court. Higgs admitted he had written to John Wilkins to come out, as requested by his brother: and had taken an active part in his behalf. He had stayed at witness' house, and he had loaned him money to go home on, &c., but was not interested in the result of the suit, &c. Had said if his name had been suggested to testator, he would probably have given his property to him, as soon as to Abraham, &c. Had said that Abraham should not have it, if there was any law to prevent it, &c., &c.

*Lewis A. Fort:* Set up with testator all the night before he died. He was very talkative during the night only when he would doze off: slept but little: to about twelve o'clock at night,

21c

he appeared to be very talkative, I suppose from fever. Did not consider him insensible up to that time. From that time on till day, his mind grew worse, and he would talk very irrational. Would frequently ask if they were not calling him, at the court house: frequently say Pike was going to make a speech and he wanted to go and hear him: frequently ask who *they* were, alluding to the bed posts. For some time, very solicitous that we should catch his horse, and wanted to go down to his plantation. Large fire in the house, and candle light all night. I left about day light, and returned in an hour and a half or two hours, and remained with him from that time, until near 12 o'clock: found his mind still flighty, and he appeared to be sinking physically. Would frequently talk as he did the previous night, often asking who was calling him at the court house. When I left him, I thought he was about drawing his last breath. I merely got out of the room to keep from seeing him die: came back in about half an hour, and found him dead. Was present when Byrne brought in the will and read it to testator. Heard Byrne ask him if he could write his name: pen was held out to him, and he took it without making any reply, that I heard. There was a paper on the back of a book, past-board or something of that sort, held up before him. At first, he seemed not to know what they wanted him to do. He was then told to write his name at a place pointed out by Byrne. He put the pen where B.'s finger was on the paper, and made some marks, rather incomprehensible to me. When they saw he could not sign his name, he was asked if Maj. Wright could sign it for him? He answered in the affirmative. Will was then taken to table for Wright to sign it, but I did not see him sign it. I suppose, from the time Byrne brought the will in to be signed, until I left to prevent seeing testator die, was within the limits of an hour. About that time, he would recognize some persons, and others he would not. He did not recognize me the last time I went to see him. About 12 o'clock the night before his death, I discovered a radical change had taken place in his mind. When the will

was taken to the table, I was left standing by the bed side. Table diagonally across room from bed towards north-east. Testator was lying with his head to south-west, on his back, face turned up. Crowd of persons between bed and table. I did not see Wright sit down to sign will. Do not think testator could have seen Wright sign will, lying in the position he was. When we were not talking with him, he was frequently speaking of various things, disconnected, so that I could not make any sense of it. I saw *Gant* sign the will, but do not think I saw Dillard sign it.

(Abraham objected to all matters of opinion given by witness, as to capacity of testator to make will, &c.)

*On cross-examination*—Heard Higgs ask testator during the night before he died, what disposition he would make of his property if he should die. His answer was vague and indefinite. When his mind was drawn to any particular subject, and he was asked a question about that subject, if it required a short answer, yes, or no, he would generally answer it correctly.

REBUTTING TESTIMONY ON THE PART OF ABRAHAM.—*J. L. Howard*—Stayed all night with testator some three or four months before his death. He was sick: said he was going to the mountains, and would have to get some one to attend to his little business: requested me to tell Abraham to come and see him, and said he believed he would give Abraham all his property, or what little he had.

*Henry M. Lemay:* Heard testator say, that the girl, *Sarah Jane*, and *Bill*, were given to him by John Lemay, with the express understanding, that they were to be set free at his death. The boy, John, was born of the girl, Sarah, after she had been given to testator.

*John McCan:* Heard testator say, while he was contending with Henry Lemay for certain property given him by John Lemay, deceased, that it was not the value of the property that he was after, but that he would spend all he was worth, or carry out the wish of his deceased friend. Said it was the wish of

John Lemay, that the negro, Sarah Jane, should be set free at his death.

Abraham also read in evidence, the order of the Probate Court, admitting the will to probate, &c., and appointing him executor, &c.   Before the examination in chief closed, he proved the death of *Gant*, and his signature as one of the subscribing witnesses to the will.

The above is the substance of all the testimony offered or introduced by the parties on the trial.

Abraham moved the following instructions to the jury:

1. The law presumes every one to be sane and capable of disposing of his property, by will, until the contrary appear.   The burthen, therefore, of showing that Allen T. Wilkins was insane, or incapable of making this will, devolves upon the party who impeaches it.

2. Mere imbecility of mind, in a testator, will not invalidate his last will and testament.   That every person, not entirely deprived of reason, be his understanding ever so weak, is legally capable of disposing of his property by will; and courts, in passing on the validity of a will, do not measure the extent of the understanding of the testator, if he be not totally deprived of reason: whether he be wise or unwise, he is the lawful disposer of his property, and his will stands as a reason for his action.

3. Unless the jury believe from the evidence, that said Allen T. Wilkins was entirely deprived of his understanding, they cannot, by law, find against the validity of this will, upon the ground that he did not have sufficient mental capacity to dispose of his property by will.

4. That a man's capacity may be perfect, to dispose of his property by will, and yet, be inadequate for the management of other business.

5. That affirmative facts prove the existence of mind, and when that is once shown, the negative go only to show its defects and weaknesses, not its entire deprivation.

6. If Wilkins was beside himself at some times, but not con-

tinually, and it is doubtful whether the will was made while he was of sound memory or no, then, in case the jury believe, that the will is so conceived, as thereby no argument of phrenzy or folly can be gathered therefrom, it is to be presumed that the same was made during the time of his calm and clear intermissions.

7. In determining whether the testator was capable of making a will, it is important for the jury to consider the attendant circumstances: such as the interests he has favored, and the relations existing between him and those so favored by the will.

8. Evidence of the general knowledge and understanding of the testator, that he was the owner of property, and had the power of disposing of it by will, or his previous declarations and intent as to its disposition, and of his gratitude, friendship, or attachment to the donees, is proper matter for the consideration of the jury in determining the issue in this case.

9. If a party impeaches the validity of a will on account of a supposed incapacity of mind in the testator, it is incumbent on him to establish such incapacity by the clearest and most satisfactory proofs: the burthen of proof rests upon the party attempting to invalidate what, on its face, purports to be a legal act.

10. Although the opinion of the physician is competent, yet, the jury, in determining the question as to the capacity of the testator, are to form their own opinions and conclusions from the facts proved on the trial, in accordance with the principles of law, given them in charge by the court, and are not concluded by the opinions of any of the witnesses.

11. If the will was attested in the same room, the law will presume it to have been in the presence of the testator, and if he might have seen the witnesses attest, it is the same as if he had been actually looking at them when they subscribed their names. The object of the law in requiring the will to be attested in the presence of the testator, is to prevent another instrument being substituted in the place of the one intended as his will.

The court gave all of the above instructions but the *second, third* and *fifth*, and Abraham excepted to the decision of the court refusing these.

The petitioner moved the following:

1. If the jury believe from the the evidence, that the instrument, purporting to be the last will and testament of deceased, was signed by the attesting witnesses thereto, whilst the testator was in a state of insensibility, or not conscious of the disposition that was being made of his property, they must find for petitioner, against the validity of the will.

2. If the jury believe from the evidence, that testator's mind labored under such a delusion or derangement as to incapacitate him from making a rational disposition of his property, shortly before, as well as after the execution of the will, mere proof of calmness, or testator possessing the power to answer common and familiar questions propounded to him, at or near the time of the execution of the paper purporting to be the last will and testament, are not sufficient to rebut the presumption against the paper.

3. If the jury believe from the evidence, that the mind of the testator was laboring under delusion, or derangement, shortly before the execution of the will, such as to incapacitate him from making a rational disposition of his property, they must find for the petitioner, and against the will, unless the jury believe, from the evidence, that his mind was free from such delusion, or derangement, at the time of the execution of the will, the burthen of proving the same devolving upon the person setting up the will.

4. If the jury believe from the evidence, that the testator's mind, shortly before the execution of the instrument, purporting, &c., was laboring under delusion or derangement, such as to incapacitate him from making a rational disposition, and do not believe from the evidence, that at the time of the execution of the same, the mind of the testator was in such a condition as to enable him to be conscious of, and understanding the nature of the said instrument, the relative situation of his family and connections, the general extent of his property disposed by the same,

and that the same was disposed of according to testator's desire, they must find against the will.

5. If the jury believe from the evidence, that the said testator, at the time of the signing and sealing said instrument, was not mentally capable of making a rational and intelligent disposition of his estate, they must find against the will.

6. That if the jury believe from the evidence, that at the time of the signing of the said testator's name to the instrument, and the attesting the same by the attesting witnesses, the testator could not have seen said acts done, they must find for petitioner, unless the same were acknowledged by him.

The court gave all of these instructions, and Abraham excepted.

The jury returned a verdict against the validity of the will, and judgment was rendered accordingly.

Abraham moved for a new trial, on the grounds: 1st. That the court admitted illegal and incompetent evidence, &c.: 2d. The court refused to give certain instructions moved by Abraham, and gave those moved by petitioner, &c.: 3d. The verdict is contrary to law, evidence, and the instructions of the court.

The court overruled the motion for a new trial, and Abraham excepted, took a bill of exceptions setting out the evidence, &c., and appealed to this court.

1. It is insisted by the counsel for appellee, that the will is void, because Wright, who signed the name of testator thereto, did not, as it is alleged, subscribe his own name *as a witness.*

Every last will and testament must be subscribed by the testator at the end of the will, or by some person for him, at his request, &c. *Digest, chap.* 170, *sec.* 4.

Every person who shall sign the testator's name to any will by his direction, shall write his own name as a witness to such will, and state that he signed the testator's name at his request. *Ib. sec.* 5.

"There is no room to doubt that where another person signs the testator's name, by his direction, the will is invalid, unless

such person shall also write his own name as a witness: in other words, the réquirement of the statute, that the witness in such case, shall also write his own name, is not merely directory, to secure better evidence of the due execution of the will, but is a necessary ingredient of the attestation itself," &c. "It is clear, from the statute, that where the testator does not himself subscribe the will, the formal attestation of the person who signs his name for him is required." *In the matter of the will of Cornelius*, 14 *Ark. Rep.* 682, 683.

The 5th section of the statute of Missouri, concerning wills, is literally the same as the 5th section of our statute, above copied. In *McGee et al. vs. Porter*, 14 *Mo. Rep.* 614, the Supreme Court of that State held, that this section of the act was mandatory, and not merely directory: and that 'the failure of the person who subscribes the testator's name, by his direction, to a will, to subscribe his own name thereto as a witness, stating that he subscribed the testator's name at his request, was a fatal defect in the execution of the will.

In this case, the following form of subscription and attestation was adopted:

"ALLEN T. WILKINS, [seal.]

By MOREHEAD WRIGHT,

*In his presence, and at his request.*"

In *Sequine vs. Sequine*, 2 *Barb. Sup. Ct. Rep.* 393, Mr. Justice EDMONDS, delivering the opinion of the Supreme Court of New York, said: "I assent fully to the remark, that the requisites of the statute should be strictly enforced, and that it is far better that one, and even many, wills should be set aside, than that the safeguards which the wisdom of the statute has thrown around the aged and weak, in their dying hours, should, in the least, be impaired by a course of loose or liberal construction. But while this principle is fully implanted in the law, and while our courts have, with commendable firmness, insisted upon a rigid compliance with the formula required in our statute on wills, they

have never held that a *literal compliance was necessary.* A *substantial compliance is enough.* The Chief Justice, in delivering the opinion of the court for the correction of errors, in *Runsen vs. Brinkerhoff*, 26 *Wend.* 332, lays down the true rule, that no form of words is necessary. The only sure guide for the courts, is to look at the *substance, sense* and *object* of the law, and with the aid of these lights, endeavor to ascertain if there has been a *substantial compliance.*"

In this case, the statute was, perhaps, not *literally* complied with, but if we should say it was not *substantially* conformed to, we should be at a loss to give any clear and sensible reason for the conclusion.

Wright subscribed his own name, and clearly indicates that he signed the name of the testator, and at his request. True, he wrote his name immediately under that of the testator, but there is no good reason why this should not be as valid as if he had written it in the margin on the left. The statute does not point out the particular place on the paper where the name shall be signed. He does not expressly state that he signed it as a witness, but, in doing the act, he placed himself in the attitude of a witness to the fact.

2. It is insisted by the appellant's counsel, that the court erred in permitting the appellee to introduce the declarations of *Gant*, one of the subscribing witnesses to the will, who was deceased.

In all trials respecting the validity of any will, if any subscribing witness be deceased, or cannot be found, the oath of such witness examined at the probate, shall be admitted in evidence, and have such weight as the jury may think it deserves. *Digest*, *chap.* 170, *sec.* 35.

The appellant read in evidence the affidavit of *Gant* made in the Probate Court, upon the probate of the will. The appellee was permitted to prove declarations made by him shortly afterwards, tending to impair the effect of his affidavit.

It was held in *Stobart vs. Dryden*, 1 *Mees. & W.* 615, (quoted

with approbation in 1 *Greenl. Ev.*, *sec.* 126,) that the declarations of a deceased attesting witness, to a deed or will, in disparagement of the evidence afforded by his signature, were inadmissible.

This case has been repeatedly reviewed by the courts of this country: held to be against the weight of English authorities: not approved as sound law, and the admissibility of the declarations of the deceased witness sanctioned. See *Harden vs. Hays*, 9 *Barr Penn. Rep.* 157; *Townshend vs. Townshend*, 9 *Gill's Rep.* 419; *Losee vs. Losee*, 2 *Hill N. Y. Rep.* 612, and cases cited in note; *McElwee vs. Sutton*, 2 *Bailey's Rep.* 128; *Crouse et al. vs. Miller*, 10 *Serg. & R.* 157; *Fox vs. Evans*, 3 *Yeates* 506; *Gardenhire vs. Parks et al.*, 2 *Yerger Rep.* 23; *Lessee of Vandyke vs. Thompson et al.*, 1 *Harrington* 109.

Upon these authorities, some of which are in point, and others upon analogous principles, we think the court did not err in admitting the declarations of *Gant*, to disparage the weight to be attached to his affidavit before the Probate Court. Had he been living, he should have been called and examined, and then it would have been competent, by cross-examination, to prove his declarations. But he being dead, he could not be called, and his affidavit before the Probate Court, stood in the place of his examination. The party ought not, by the death of the witness, to be deprived of obtaining the advantage of his declarations, disparaging what he had sworn while living. 3 *Burrow* 1244; 4 *Barn. & Ald.* 55; 5 *Bing.* 435.

3. In *Kelly's heirs et al. vs. McGuire et al.*, 15 *Ark. Rep.* 601, this court held, that it was competent for witnesses to give their opinions as to capacity or incapacity, when the facts or circumstances are disclosed on which the opinions are founded. The witness, *Lewis B. Fort*, stated very fully and clearly, the facts and circumstances upon which he founded his opinions of the sanity of the testator, Wilkins. No objection appears of record to have been taken to opinions given by any of the other witnesses.

4. The exceptions in reference to the instructions are next to be considered.

The *second* and *third* instructions moved by the appellant, and refused by the court, were, in effect, that unless it was proven that the testator was *totally* deprived of *reason* and *understanding*, his will was valid.

The cases of *Jackson vs. King*, 4 *Cowen* 207, *Odell vs. Buck*, 21 *Wend.* 142, and *Stewart's Executor vs. Lispenard*, 26 *Wend.* 255, would seem to sustain this doctrine : indeed, the instructions in question appear to have been copied from the abstracts of the *Lispenard case*, where the previous New York decisions are reviewed.

*Alice Lispenard* was naturally of weak mind—a partial *idiot*, but her will was upheld because she was not entirely deprived of reason and understanding.

The doctrine of the *Lispenard* case, was urged upon this court, in support of the legal capacity of Greenbury Kelly, to dispose of property by deed, in the case of *Kelly's heirs et al. vs. McGuire et al.* Greenbury Kelly, by reason of extreme old age, disease, &c., was laboring under *dementia*, and the court, by HEMPSTEAD, Special Judge, said :

"It would be wholly impracticable to lay down any exact general rule as to incapacity to contract; because, each case will be found influenced by its own peculiar circumstances. But it may be freely admitted, that mere weakness of understanding is not, of itself, sufficient to invalidate a contract, if the person is *capable of comprehending the subject.* The law does not seem to have attempted to draw any discriminating line, by which to determine, how great must be the imbecility of mind, to render a contract void : or how much intellect must remain to uphold it. The difficulty of making such discrimination is apparent. *Jackson vs. King*, 4 *Cowen* 218."

The deed was held void, partly for want of capacity, and partly for fraud in obtaining it.

*Wilkins* appears to have been a man of good enough sense,

when in health, but, suddenly stricken down by disease, his mental powers seemed to have participated in the derangement of the physical organs upon which they were dependant for manifestation.

It appears from the above extract in the Kelly case, that this court, to some extent, recognized the correctness of the doctrine of the Lispenard case, but we are not warranted, from the language used, in saying that they meant to approve the full scope of the doctrine, that there must be a *total deprivation of reason and understanding,* to render a deed or will invalid at law.

We do not propose to say more, in this case, upon this point, than was said in the Kelly case, deeming it unnecessary, in view of the final disposition which we shall make of the case.

The *fifth* instruction moved by the appellant and refused by the court, is copied from *Dean's Medical Jurisprudence, p.* 556. It is Mr. DEAN's mode of expressing one of the doctrines established by the Lispenard case. Though, perhaps, logically correct, it is rather a proposition in mental philosophy, than a practical principle of law. It might have been given to the jury without error, but was hardly necessary, to enable them to come to a correct conclusion as to whether the testator was rational— whether he was sufficiently in his senses to understand what he was doing, when the will was executed or not.

The appellant made a sweeping objection to all of the instructions given by the court to the jury, at the instance of appellee. No specific objection is urged to any one of them in the argument here, except to the *sixth.*

It is manifest, from the *eleventh* instruction, given at the instance of the appellant, and the *sixth,* given on the motion of the appellee, that the court, and the counsel for both parties were under the impression, at the time this cause was tried, that the statute required the witnesses to subscribe the will in the *presence,* actual or constructive, of *the testator.*

The *fourth section of chapter* 170, of the *Digest,* which prescribes the formula to be observed in the execution of wills, does

not require the witnesses to subscribe their names to the will in the presence of the testator. The 19th section of the same chapter provides for the taking of the deposition of a subscribing witness, when he is prevented by sickness from attending at the time any will may be produced for probate, before the Probate Court, or clerk thereof in vacation, or resides out of the State, or more than sixty miles from the place where the will is to be proven: and the 20th section requires such witness to state, in his deposition, that he subscribed the will, in the *presence of the testator*. There is, therefore, an incongruity between the 4th and 20th sections. Had they been construed *in pari materia*, possibly they might have been made to harmonize; but, in *Rogers vs. Diamond*, 13 *Ark. Rep.* 487, they were construed independently, and the 20th section held only to apply to the deposition of the witness, and what statements it must contain, where his personal attendance cannot be had before the Court of Probate.

According to the case of *Rogers vs. Diamond*, it would seem, therefore, that the law stands thus: If the witness be personally present in court, &c., to prove the execution of the will, he *need not state* that he subscribed it in the *presence of the testator;* but if his deposition be taken, he is required to state that he subscribed *in the presence of the testator;* so that, in such cases, the validity of the will would be made to depend upon the mode in which the proof is taken. There is surely no valid reason for such a distinction. The fault, however, is in the Legislation; and deeming it highly impolitic to change the decisions of this court upon important branches of the law, like this, we shall not review the case of *Rogers vs. Diamond*, for the purpose of attempting to harmonize the incongruity between the provisions of the statute which we have been considering, deeming it the more appropriate province of the Legislature to amend the sections, so as to make them harmonize.

We must hold, therefore, upon the authority of *Rogers vs. Diamond*, that the court below erred in giving the *sixth* instruc-

tion moved for the appellee: but, it is to be presumed that the error was *neutralized* by the *eleventh* instruction, given to the jury, at the instance of the appellant.

5. The reversal or affirmance of the judgment of the court below in this case, does not depend upon the question, whether the court did, or did not err, in some of its decisions, pending the trial, but upon the question whether, upon the whole record, the decision of the court, overruling the motion for a new trial, was right. The jury, upon all the evidence introduced, or offered by the parties, rendered a verdict against the validity of the will; and, no doubt, upon the ground of the mental incapacity of the testator. We cannot conclude, upon all the facts of the case, that their determination was influenced by any misdirection of the court. The evidence clearly supports the verdict. We think that no impartial mind can examine the testimony, and avoid the conclusion, that at the time the will was signed for Wilkins, his powers of intellect were too far wasted and deranged by the violent disease, which was pressing him into the grave, and which terminated his mortal existence so shortly afterwards, to make a rational disposition of his property. He was, evidently, laboring under delusion from about 12 o'clock of Saturday night, until he died, between 12 and 1 o'clock of the next day. When he was aroused from his reveries, and his attention called to any particular thing, he seemed to understand it, but his mind soon again relapsed, and went upon its incoherent wanderings. He had lost the power of discriminating objects, and of combining and arranging ideas; or to use the expressive language of Major Wright, "his mind was not strong enough to *organize* anything." Seemed, at times, to be unconscious of his real condition—wanted his horse caught to ride to his farm—desirous to go to the court house and hear Captain Pike argue a case, in which he had been interested, &c.—fancied he was working at the forge, and directed the striker to *blow up*. The inanimate bed posts assumed, in his delirious mind, the forms of men, and again, of pipe stems, &c. True, he directed Mr. Byrne to pre-

pare his will; but, before this, on the same morning, he requested Mr. Young to write a will, making a different disposition of his property.

We cannot suppose, that if the case were reversed, and sent back for a new trial, another jury, upon the same evidence, and a correct interpretation of the law, would sustain the validity of the will. Upon the whole record, therefore, the judgment is affirmed. *Zachary vs. Pace*, 4 *Eng.* 213; *Gibbon vs. Dillingham*, 5 *Ib.* 16; *Jordan vs. Foster*, 6 *Ib.* 139.

Hon. C. C. Scott, Judge, absent.